IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 16, 2024 Session

## STATE OF TENNESSEE v. WILLIAM ROGER CAMPBELL

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2021-CR-761  Robert Bateman, Judge**

_____

**No. M2023-00779-CCA-R3-CD**

_____

The defendant, William Roger Campbell, was convicted by a Montgomery County jury of two counts of premeditated first-degree murder, and the trial court imposed consecutive life sentences. On appeal, the defendant argues that the trial court erred in admitting one of the victim's cellphone records into evidence; the evidence is insufficient to sustain his convictions; and the trial court erred in ordering his life sentences be served consecutively. Following a thorough review of the record, the briefs, and oral arguments of the parties, we affirm the defendant's convictions. However, we reverse the imposition of consecutive sentences and remand to the trial court for a new sentencing hearing for consideration of the consecutive sentencing factors outlined in *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995).

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Reversed in Part; and Remanded**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Kendall Stivers Jones, Assistant Public Defender – Appellate Division, Tennessee Public Defenders Conference (on appeal); Roger Nell and Joseph Price, Assistant Public Defenders (at trial), for the appellant, William Roger Campbell.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Robert J. Nash, District Attorney General; and Marianne L. Bell and Crystal Morgan, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## *Facts and Procedural History*

In January 2010, eighty-two-year-old William "Bill" Campbell and eighty-one-year-old Ina Lucille Campbell,[1] the victims, were both shot in the head while they were sleeping. Eleven years later, in June 2021, their adopted son, the defendant, was indicted for their premeditated first-degree murders. The State's theory at trial for the motive of the murders was that the defendant was in debt, and as the secondary beneficiary in his parents' wills, would only inherit if both were deceased.

Daniel Champagne had lived next door to the victims since 1972 and considered Mr. Campbell to be a second father. He said the victims had one child, the defendant, whom Mr. Champagne first met when the defendant was twelve or thirteen years old. Mr. Champagne recalled that the defendant joined the military and then moved away but he would return home to visit the victims from time to time.

Mr. Champagne had a key to the victims' home and knew the inside of their home as well as he knew his own. Mr. Champagne learned the victims' routines over the years, noting that Mr. Campbell went to the mailbox to get the newspaper first thing in the morning. When he went to visit the victims and knew they were home, Mr. Champagne entered through the back door. He recalled that Mrs. Campbell collected crystal and Mr. Campbell "was an avid gun collector. He had an enormous collection of rifles and pistols." Mr. Champagne noted that the victims' dogs barked when anyone entered the house.

Mr. Champagne said that the victims would do anything for the defendant, and if the defendant wanted something, they would get it for him. Mr. Champagne heard the victims talking a couple of times before their deaths about selling some weapons to get money. Mrs. Campbell was asking Mr. Campbell for money, and Mr. Champagne had perceived over the years that financially supporting the defendant was a source of contention between the two of them.

Mr. Champagne knew the defendant visited his parents the week of January 24, 2010, because the defendant's gray Ford F-150 truck was parked in the driveway. Mr. Champagne last remembered seeing the defendant's truck the morning of Wednesday, January 27, when Mr. Champagne saw Mr. Campbell get his newspaper from the mailbox and the two talked for several minutes before Mr. Campbell walked towards his back deck. That was the last time Mr. Champagne saw Mr. Campbell alive.

---

[1] Because the defendant, the victims, and some of the witnesses have the same surname, we will refer to them by first name at times for clarity. We mean no disrespect by this practice.

Around 6:00 p.m. on Friday, January 29, Mr. Champagne received a call from the neighbor who lived across the street from the victims, telling him that she had been trying to reach the victims because she hit their mailbox when she backed out of her driveway. There had been a bad winter storm, and the roads were covered in sleet and ice. The neighbor asked if Mr. Champagne had heard from the victims because they had not answered her calls. Mr. Champagne also tried to call the victims, and when they did not answer, he decided to walk over and check on them. Mr. Champagne walked through the gate that connected their backyards and saw that the glass was broken on the door leading into the basement and the door was ajar. However, Mr. Champagne did not see any footsteps in the snow. The basement was ransacked and there were pill bottles all over the floor. Mr. Champagne went up the stairway leading to the kitchen, while calling for the victims, but the dogs barked in response.

Mr. Champagne proceeded through the house, observing open drawers in the dining room cabinet and items strewn onto the floor, while he continued to call for the victims. When he went through the hallway toward the bedrooms, he noticed that Mr. Campbell's bedroom door was closed, which was unusual. Mr. Champagne opened the door and saw Mr. Campbell lying in the bed with blood on him. Mr. Champagne went to check Mrs. Campbell's bedroom, opened the door, and found her in the same condition. Mrs. Campbell's bedroom had been ransacked and drawers pulled out of her dresser, but Mrs. Campbell still had rings on her fingers. Mr. Champagne went back to his house and called the police.

Mr. Champagne saw the defendant at the victims' funeral and noted that he "didn't seem very shocked or upset." About a week after the funeral, Mr. Champagne saw the defendant and a woman in a red pickup truck at the victims' home, loading the truck with items.

Deputy Pete Millan worked for the Clarksville Police Department ("CPD") at the time of the offense. On January 29, 2010, Deputy Millan assisted in a welfare check at the victims' home around 7:00 p.m. It was very snowy that evening, and the driving conditions were "terrible." When Deputy Millan arrived, he and his partner entered the house through the rear basement door like Mr. Champagne had done. The officers cleared the house room by room, eventually reaching the upstairs bedrooms. In Mrs. Campbell's bedroom, Deputy Millan saw what appeared to be a human body on the bed, and a similar shape was on the bed in Mr. Campbell's bedroom. Deputy Millan observed a wound to the back of Mr. Campbell's head and began securing the scene. Deputy Millan noted there was an "extremely aggressive" small dog in the room with the male victim that animal control had to remove in order for emergency personnel to access the victim.

Detective Timothy Finley, who had retired from the CPD by the time of trial, responded to the scene shortly after the initial patrol officers. When he arrived, there were two dogs still inside the house, and one of the dogs "wasn't being real friendly." Detective Finley requested additional support from the rest of the homicide unit, and Detective Tim Anderson with the CPD took over as the lead detective. Detective Finley requested Mr. Campbell's cellphone records from New Cingular Wireless at Detective Anderson's direction. Detective Finley received the records, and the records showed that no calls were placed from Mr. Campbell's cellphone number from January 28 to February 1, 2010. The last call made from Mr. Campbell's phone was on January 27, 2010. However, Detective Finley agreed that based on his review of the records, Mr. Campbell would routinely go several days without using his cellphone.

Detective Tim Anderson, who had retired from the CPD by the time of trial, led the investigation in the case. He recalled that officers had difficulty responding to the scene due to the weather, and dogs hindered first responders from getting to the victims. However, animal control had removed the dogs by the time he arrived. In his survey of the scene, Detective Anderson noticed that both victims were in their beds and appeared to simply be asleep if not for the gunshot wounds to their heads. Mrs. Campbell's bedroom was "in somewhat of disarray," with drawers pulled out of the dresser and items on top of the dresser shuffled around, but "[n]othing appeared disturbed in Mr. Campbell's room." Detective Anderson noted that in Mr. Campbell's room there was a wooden gun rack with glass-front doors and several firearms "obviously visible" through the glass door, as well as a handgun lying under the edge of the bed. The initial responding officers had described the scene as a possible "burglary-type situation," and Detective Anderson thought "something went terribly wrong during [the] burglary" for there to still be guns in the residence because "that's the number one thing that gets stolen . . . during burglaries."

Detective Anderson also noticed a few things amiss in the victims' kitchen. There were no grounds in the coffee pot and the trash can appeared to have been emptied. He also noted that in what appeared to be a medication log, there was no entry for January 28. In the mailbox outside, there were still newspapers for January 28 and 29. Detective Anderson described that the temperature in the home was "[f]airly warm[.]"

Detective Anderson learned that the defendant was the victims' son, and he contacted the defendant to notify him of his parents' deaths and to inquire about the defendant's recent visit with the victims. The defendant told Detective Anderson that he had just visited his parents, having arrived on January 24 and "le[aving] on the morning of the 28th, about 7 a.m." The defendant relayed that, while there, he had accompanied his parents to a veterinary appointment concerning one of the dogs. He said his parents had no other visitors while he was in town, and he stayed in the basement bedroom that had the sliding glass door to the outside of the house.

- 4 -

Detective Anderson decided that he need to speak with the defendant in person, and on January 31, he and Sergeant Lon Chaney with the CPD made the "[c]lose to nine hour[]" drive to Lowndes County, Georgia. When they arrived, the officers parked up the street from the defendant's home to conduct surveillance while calling the defendant. Detective Anderson called the defendant and asked him if they could meet at the sheriff's department to review some photographs. The defendant agreed to meet the officers. Shortly thereafter, the defendant walked out of the house carrying a walking cane. The defendant did not use the cane for support but, instead, carried it and placed it in the backseat of his vehicle.

When they all arrived at the sheriff's department, Detective Anderson observed the defendant retrieve his cane and use it with "what appeared to be some difficulty" as he entered the facility and walked to the interview room. Once Detective Anderson and the defendant sat down to talk, the defendant denied that there had been "any family problems" recently or that the victims had any enemies. The defendant said "they were just an old couple, just old people." The defendant gave the officers consent to search his vehicle. One of the items recovered in the search was a gas receipt from Watson's Food Store in Cordele, Georgia, dated January 28, 2010, at 3:29 p.m. After the search revealed bedsheets shoved under the truck seat, Detective Anderson asked the defendant if he had brought anything back from his parents' house when he left, "specifically any items of cloth," and the defendant said he had not. Detective Anderson pressed a second time, referring to "a washcloth, a towel, bedding[,] [a]nd again, [the defendant] said that he did not." However, the defendant did admit to bringing back an electric throw blanket.

Sergeant Lon Chaney described the assistance he provided in the investigation of the case. Sergeant Chaney accompanied Detective Anderson to Georgia on January 31, 2010, to speak with the defendant in person. Sergeant Chaney conducted a search of the defendant's gray Ford F-150 in the parking lot of the Lowndes County Sheriff's Department. There was an envelope under the driver's seat with a handwritten note that said, "Give to Roger." Eight credit or gas cards, in either the defendant's or his girlfriend's, Gayle Tune, names, were located in the vehicle. Two bedsheets with a "reddish stain" were found under the back bench seat.

The defendant and Ms. Tune also gave Sergeant Chaney and Detective Anderson permission to search their home, stating "they wanted to help with the investigation however they could." Detective Anderson noted that the defendant did not use a cane for assistance to walk while at his home. In the home, the officers saw "[j]ewelry laid out" and more credit cards. They also discovered a piece of mail from the Pioneer American Insurance Company addressed to "William R. Campbell" on Jackson Road in Clarksville; an envelope addressed to "Mrs. William Campbell" on Jackson Road in Clarksville; and a Chase Visa credit card statement from early 2009 showing a balance of $22,861.72 that

included charges made in Georgia. The Chase statement gave no indication of the names on the credit card account.

After the officers returned to Clarksville from Georgia, Sergeant Chaney and Detective Anderson conducted another search of the victims' home on February 2, 2010. The officers found lockboxes under the bed in Mr. Campbell's room and in the top of his closet, a loaded and holstered firearm under Mr. Campbell's bedroom dresser, a firearm and cash inside the drawers of that same dresser, a jewelry box, two jars of loose change and rolled coins, and a $5000 life insurance policy with a note that stated, "Roger, keep address in case of death with death certificate." Sergeant Chaney was not sure if the lockbox under Mr. Campbell's bed was in plain view but said that the lockbox in the closet would have been "hard to see from standing on the ground."

Sergeant Chaney stated that the alarm clock in Mr. Campbell's bedroom had alarms programmed for 4:00 a.m. and 4:04 a.m., and the analog alarm clock in Mrs. Campbell's bedroom had an alarm set to go off around 3:15 or 3:20 and would do so every twelve hours. Sergeant Chaney also investigated the sliding glass door in the basement and found that, although the lock worked, if the lock were engaged while the door was open, the lock would disengage when the door was shut.

On February 3, 2010, Detective Anderson received a call from the defendant stating he was going to be in Clarksville for a memorial service for the victims and wanted several items from the victims' home, including a Bible, their address book, and copies of their wills. Detective Anderson attended the graveside service for the victims and saw the defendant there with his attorney, Randy Miles. Detective Anderson did not know the nature of Mr. Miles' representation of the defendant. Mr. Miles approached Detective Anderson at the service and asked him to leave, explaining that Detective Anderson's presence was "making the family nervous."

Detective Anderson and Sergeant Chaney returned to the victims' home again on February 5, 2010, to investigate the safe in the basement. The combination to the safe was written on a business card that was lying on top of the safe. Inside the safe, officers found jewelry, firearms and magazines, a knife, a pocket watch, a $100 bill, and "personal documents [and] insurance stuff[.]"

Officer Scott Beaubien with the CPD was one of the officers responsible for processing the crime scene, which included logging the photographs taken by another officer and creating a sketch of the home's interior. Officer Beaubien recalled that the house was "pretty warm" and there was an odor. Both victims "were on oxygen," and the machines were running when the police arrived.

As he processed the scene, Officer Beaubien noted that dresser drawers were pulled open in both Mr. Campbell's and Mrs. Campbell's bedrooms. A .25-caliber automatic shell casing was found on Mr. Campbell's bed next to his pillow, and a rifle was next to the door in Mr. Campbell's bedroom. Two boxes of .25-caliber automatic mixed ammunition were found in the gun cabinet in Mr. Campbell's bedroom, with 41 rounds in each box. A .25-caliber automatic shell casing was also found in Mrs. Campbell's bedroom, on the floor behind her nightstand. Individual boxes of jewelry and jewelry trays were at the foot of Mrs. Campbell's bed.

In the dining room, Officer Beaubien noted that several drawers of the hutch were open. On the server in the dining room, Officer Beaubien found an envelope containing $240 dollars with a handwritten note on the outside of the envelope that said, "$240, got now," and "$200, owe." A newspaper dated January 27, 2010, was also on the server in the dining room. Inside the china cabinet, Officer Beaubien came across what appeared to be a medication log with the final entry on January 27, 2010. Another logbook of some type was lying on the dining table with the date of January 27, 2010. In the kitchen, a bottle of Clorox bleach on top of the washing machine and a bottle of Palmolive dish soap at the sink were documented. It was noted that there were no coffee grounds in the coffee pot.

The water in the sink of the downstairs bathroom was still running, and a bottle of Clorox bleach was noted in the bathroom. One of the bedrooms downstairs had a bed with no sheets on it. The other bedroom downstairs also contained a bed, but it appeared as if the room was primarily used for storage of boxes, hanging clothes, and miscellaneous items such as a "[s]ilver-like serving set." A gun safe was located in the basement, and inside it was a .25-caliber automatic Iver Johnson handgun. A pack of Marlboro Light 100 cigarettes, as well as a partially burned cigarette, sat on top of the gun safe.

Officer Bradley Crowe, who was retired from the CPD at the time of trial, was also involved in processing the scene. Officer Crowe was primarily involved with the collection of evidence. Officer Crowe processed the kitchen floor for footprints but was unable to lift any because "prints can be very finicky." He also swabbed items throughout the house, including "anything that looked like it had been pulled open, touched, that was out of its natural place." Officer Crowe recovered two boxes of .25-caliber ammunition from the gun cabinet in Mr. Campbell's bedroom. The boxes appeared to be different types because the rounds in one box had a red coating and the rounds in the other box had a copper jacket with no red coating. Officer Crowe noted that there were ten rounds missing from one of the boxes and eleven rounds missing from the other box. From the dining room, Officer Crowe collected a January 27, 2010 newspaper, a Mead notebook that contained handwritten logs by dates with the last entry on January 27, 2010, and a spiral notebook that contained what appeared to be a medication log with the last entry on January 27,

2010. Officer Crowe also collected the bed covers and a pair of gray sweatpants from the downstairs bedroom, and a spent .25-caliber shell casing from each victim's bedroom.

Investigator Fred McClintock with the CPD documented the "events" that "surround[ed]" the crime scene. The temperature inside the home was 79 degrees, and there was a set of gas logs in the "stand-up gas register" in the basement that was turned three-quarters of the way up. Investigator McClintock inspected the three entry points in the basement: two sliding glass doors and one pedestrian wood door with a glass panel. One of the sliding glass units was locked and secure; the other sliding glass unit had a bar or stick placed in the track that would still allow the door to open approximately ten inches; and the pedestrian door had a pane of glass broken and its screen pushed in, which was believed to be the point of entry. Investigator McClintock determined that a person could unlock the door from the outside by reaching through the broken pane of glass. Investigator McClintock also inspected the kitchen and noticed that a bottle of dish soap had a reddish-brown stain on it, reminiscent of blood, so he swabbed the stain for testing. A presumptive field test of the stain indicated it contained blood, and the other swab was sent to the Tennessee Bureau of Investigation ("TBI") lab for further testing.

Investigator Alan Charvis, who was retired from the CPD at the time of trial, called the defendant on January 30, 2010, to inquire about the defendant's recent visit to his parents' home in Clarksville. The defendant was at his home in Georgia at the time of the call, and the defendant's girlfriend, Gayle Tune, was also on the line. Investigator Charvis described the defendant's tone as normal rather than "crying or upset." The defendant told the investigator that he left his parents' home the morning of January 28 before 7:00 a.m. The defendant said that both of his parents were awake when he left but were still wearing their pajamas. The defendant denied that either he or his parents had eaten breakfast while he was there. The defendant relayed that his father checked his blood sugar twice a day using a glucometer he kept in one of the drawers in the dining room, but the defendant did not know whether he had checked it the morning of the 28th. Investigator Charvis asked the defendant about his father's firearms, and the defendant said his father kept two firearms in the house: a .380 and a .22. The defendant mentioned to Investigator Charvis that he accompanied his mother to the Fort Campbell commissary where they ran into Linda Campbell, his ex-wife. At first, the defendant just said that he had "ran into her," but then said that his mother had "dared him" to page Linda as a joke. Investigator Charvis assisted with the collection of the contents of the drains from the kitchen and the upstairs bathroom sinks.

Several TBI agents were responsible for analyzing the various samples and evidence collected during the course of the investigation. Agent Bradley Everett tested the blood stain on the bottle of dish soap and determined that it was the defendant's blood, but he agreed that he had no way of determining how long the stain had been there. Agent Everett

also tested the drain from the upstairs bathroom sink. The presumptive test indicated the presence of blood, but Agent Everett was unable to obtain a DNA profile upon further testing. Agent Everett also tested samples taken from the stained bedsheets found in the defendant's truck, but the testing did not indicate the presence of blood. Agent Everett agreed, however, that the ability to detect blood would be affected if the sheets had been cleaned with detergent or bleach.

Agent Miranda Gaddes performed microanalysis on fibers from the bed covers and gray sweatpants found in the basement bedroom at the victims' home, as well as on the bedsheets found in the defendant's truck. Agent Gaddes found blue fibers on the bedsheets and bed covers that appeared to have been transferred from something else. Based on her analysis, Agent Gaddes determined that the fibers "could have shared a common origin" of an unknown source. The gray sweatpants did not have the same transferred fibers on them. The CPD sent Agent Gaddes several items from around the victims' house, but none of them matched the blue fibers that had been transferred onto the bed covers and bedsheets.

Agent Daniel Royse examined the two spent shell casings recovered from the victims' house. He identified one casing as a Remington Peters brand .25-caliber and the other as a Federal brand .25-caliber. Upon his examination of the casings, Agent Royse determined that both were fired from the same .25-caliber automatic pistol. Agent Royse also compared the bunter tool marks on each casing to the boxes of live shells found in the victims' home and determined that the Remington Peters spent casing came from the boxes of live ammunition found in Mr. Campbell's room.

Medical examiner, Dr. Amy Hawes, performed the autopsies on the victims. Mr. Campbell was 82 years old at the time of his death, and Mrs. Campbell was 81 years old. Dr. Hawes determined that both victims died from a "gunshot wound of the head" by "another person or persons." Mr. Campbell's gunshot wound entered the back left side of his scalp, and there was discoloration around the wound indicating the gun was held very close to his skin when it was fired. Mrs. Campbell's gunshot wound entered through her left cheek, and powder stippling around the wound indicated the firearm did not make contact with her skin.

Dr. Hawes noted that "the progress of decomposition is extremely variable" and "extremely dependent primarily on temperature among other things," meaning time-of-death determinations were usually estimates within a 12- to 24-hour window. Dr. Hawes estimated that Mr. Campbell died approximately 24 hours before his body was discovered. She estimated that Mrs. Campbell's time of death was "approximately the same as it would [be] for [Mr. Campbell]. Somewhere in the neighborhood of 24 hours, potentially 24 to 36 hours."

Shawn Campbell, the defendant's son and victims' grandson, testified that his parents divorced when he was a baby, and although he lived with his mother, he maintained a close relationship with his father's parents while he was growing up. Shawn said that he, however, had no relationship with his father and probably "spent less than 24 hours around him" his entire life. The only time Shawn saw his father was when he was visiting his grandparents, and the defendant happened to be there for a visit as well. Shawn visited his grandparents regularly as a child but admitted his visits became less frequent as he got older. Shawn recalled that Mrs. Campbell collected crystal, china, and Hummel figurines, and Mr. Campbell was believed to keep a log of the guns he owned. From Shawn's observations, the defendant seemed to be a lot closer to Mrs. Campbell than to Mr. Campbell.

Shawn was with his mother, Linda, at her house when a deputy from the Montgomery County Sheriff's Office arrived and informed them that Mrs. Campbell and Mr. Campbell had died. Shawn said the defendant had always had a slight limp due to an accident, but Shawn noted that the defendant did not have any difficulty standing at the funeral. Sometime after the funeral, an auction was held at the victims' home. Shawn attended the auction and purchased a few items as keepsakes, and he later purchased Mrs. Campbell's truck as well.

Linda Campbell worked as the lead accounting store clerk at the commissary at Fort Campbell and during her years of working there, had never seen the defendant or the victims there. However, on Tuesday, January 26, 2010, she was in her office at the commissary when she was paged to Register 17. When she got to the register, the defendant and Mrs. Campbell were there checking out groceries. Linda had not seen the defendant in thirteen years at that point. He did not appear to be physically disabled in any way or have a cane or walker. The defendant said to Linda, "I want you to know I'm leaving on Thursday," causing Linda think to herself, "okay, great, you're leaving on Thursday, . . . . why do I care when you're leaving[,] . . . why do you need to tell me?"

Linda learned about the victims' deaths a few days later, on Friday evening, when it was snowing heavily. Officers came to her house and told her that both Mr. Campbell and Mrs. Campbell had died. Linda inquired further as to the cause, but the officers would not provide additional details. Linda attended the funeral and observed that the defendant had "[n]o tears, no emotion, no[t] upset." The defendant did not use a cane or walker or appear to need any assistance walking. Linda recalled that Mrs. Campbell "would give [the defendant] everything and anything." She said Mrs. Campbell spent a lot of money on the defendant and spoiled him.

Dr. Jackie Smith, a veterinarian, took care of the victims' pets over the years. In January 2010, the victims had two dogs that were patients of Dr. Smith's—Lucky, a black Lab mix, and Patino, a small Terrier mix. Lucky was a "happy-go-lucky" dog, but Patino was temperamental and had to be handled with caution. Bloodwork indicated that Lucky was in renal failure, which precipitated a series of office visits in late January. On January 27th, Mr. Campbell came in with the defendant to discuss Lucky's condition and treatment plan. Dr. Smith allowed Lucky to return home but advised Mr. Campbell that he might need to decide about euthanasia soon.

Major Andrew Schmidt, a horologist and owner of what was formerly called "It's Time Clock Shop" in Clarksville, was familiar with the victims because Mr. Campbell owned a rare and elaborate Lenzkirch grandfather clock that was "the epitome of horology," and Major Schmidt performed annual in-home services on the clock. Major Schmidt offered to purchase the clock each time he performed a service call, but Mr. Campbell always declined. Specifically, during a service call on July 28, 2009, Major Schmidt offered to buy the clock for $5000, while in the presence of the defendant, but Mr. Campbell declined this offer as usual.

In February 2010, Major Schmidt received a call about purchasing a grandfather clock. Major Schmidt did not associate the caller's name with anyone he knew, but when he reached the address provided by the caller, Major Schmidt realized it was Mr. Campbell's house and felt "a very high-point glee." Major Schmidt was met at the door by the defendant, and when Major Schmidt inquired about Mr. Campbell and Mrs. Campbell, the defendant stated, "Well, Didn't you hear? . . . Mom and Dad were shot and killed in their bedroom." Major Schmidt described the defendant's demeanor as "[n]ervous and jerky," which was different from his behavior in 2009 when Major Schmidt first saw him. Upon learning this information, Major Schmidt said that he could not purchase the clock because their estates were in probate, but the defendant responded, "I am the sole heir of the estate and it is clear for me to sell." The defendant first wanted $6000 for the clock but eventually accepted Major Schmidt's original offer of $5000. Major Schmidt paid the defendant in cash and gave him a receipt. A short time after the sale, Detective Anderson came into Major Schmidt's shop to ask about the clock.

Montgomery County Chancery Court Clerk and Master Heather Moore maintained the probate files for the separate estates of Mrs. Campbell and Mr. Campbell. On February 26, 2010, the defendant filed letters of administration in both cases, which is done when a victim died intestate. Both letters listed the defendant as the sole heir. A preliminary inventory was filed for both estates on September 17, 2010, valuing Mrs. Campbell's estate at $120,472.39 and Mr. Campbell's estate at $130,964.25.

On December 9, 2010, Clerk Moore received notice that Mrs. Campbell's and Mr. Campbell's wills had been filed with the court, but the discovery of the wills did not alter how the estates were probated because the documents contained no specific bequests and followed the rules of intestacy. Both estates were closed on November 4, 2011; the final accountings showed distributions of $74,083.31 and $107,332.29, respectively, to the defendant.

Upon the conclusion of the proof, the jury convicted the defendant of two counts of premeditated first-degree murder. The trial court conducted a sentencing hearing, after which it imposed consecutive life sentences. The defendant appealed.

*Analysis*

On appeal, the defendant argues that the trial court erred in admitting a victim's cellphone records into evidence; that the evidence is insufficient to sustain his convictions; and that the trial court erred in ordering his life sentences be served consecutively. We will address each issue in turn.

## I.     Admission of Cellphone Records

The defendant argues that the trial court erred in admitting his father's cellphone records into evidence without following the procedure for admission under the business records exception to the rule against hearsay, which required that the records be introduced through the testimony of a custodian or a self-authenticating affidavit from a custodian pursuant to Tennessee Rules of Evidence 803(6) and 902(11). The State concedes that the appropriate procedure was not followed when introducing the records but asserts that the error was harmless. We agree with the State.

Tennessee Rule of Evidence 803(6) provides an exception to the rule against hearsay for records of regularly conducted activity as follows:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this

paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

Tennessee Rule of Evidence 902(11) provides the procedure for authentication of certified records of regularly conducted activity as follows:

> The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by an affidavit of its custodian or other qualified person certifying that the record:
>
> > (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of and a business duty to record or transmit those matters;
> >
> > (B) was kept in the course of the regularly conducted activity; and
> >
> > (C) was made by the regularly conducted activity as a regular practice.
>
> A party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

Detective Finley testified at trial that at some point during the investigation, Detective Anderson directed him to request Mr. Campbell's cellphone records. After the prosecutor passed Detective Finley a set of documents, defense counsel requested a bench conference. Counsel told the trial court that he believed the documents stemmed from a subpoena issued to AT&T but "[t]here's no business certification for 902(11) indicating these are business records for the company[.]" The trial court conducted a jury-out hearing, during which counsel restated his objection to the admission of Mr. Campbell's cellphone records. Counsel explained that he received eight pages of records that appeared to have been sent from AT&T by fax, but the records lacked any certification from AT&T and, thus, did not satisfy the requirements of Tennessee Rule of Evidence 902(11).

The State responded that a judge signed a subpoena for the records on February 1, 2010. The subpoena was sent to the custodian of records for New Cingular Wireless,[2] and the custodian of records was commanded to produce the records for Mr. Campbell's cellphone number to Detective Finley. The phone records revealed no calls from January

---

[2] New Cingular Wireless was later acquired by AT&T.

28 to February 1, 2010, and provided the records for all calls made from January 1 to January 27. The State asserted that the records were admissible without an affidavit from the custodian of records because they were received in response to a subpoena from a judge. The trial court told the parties it would rule on the objection the following morning.

The jury-out hearing continued the next day. The State restated its position that

> there is not an affidavit from the custodian of records, however, these were given to Detective Finley in response to a judicial subpoena and in response to an affidavit that he made to the Judge regarding exactly what he wanted and AT&T exactly produced what was requested. And so [w]e believe that although it's hearsay, it is reliable hearsay that was made available to him pursuant to a judicial subpoena and that is should be admissible.

Detective Finley was called to the stand and testified that he recognized the records at issue. The first page was the affidavit for judicial subpoena to New Cingular Wireless that he prepared. In the affidavit, Detective Finley requested, in part, the incoming and outgoing call detail from January 1 to February 1, 2010, for Mr. Campbell's cellphone number. A judge signed the subpoena, and Detective Finley faxed it to the attention of the custodian of records at New Cingular Wireless per departmental procedure. The subpoena provided instructions that New Cingular Wireless should deliver the requested information to Detective Finley by hand, mail, fax, or email. Detective Finley received the requested information on March 9, 2010, "from the National Compliance Center from AT&T." The records revealed that there were no calls sent or received from January 28 to February 1, 2010. On cross-examination, Detective Finley admitted that he did not know which employee at "the Compliance Center" prepared and sent him the phone records.

The trial court found that a judicial subpoena was issued pursuant to Tennessee Code Annotated section 40-17-123 for cellphone records for Cingular Wireless, a subsidiary of AT&T, and said that it reviewed "the small amount of case law" interpreting the statute. Specifically, the court said that it reviewed *State v. Brown*, 2019 WL 1514551 (Tenn. Crim. App. Apr. 8, 2019), *State v. Bond*, 2016 WL 4548107 (Tenn. Crim. App. Aug. 31, 2016), and *Fry v. Indiana*, 885 N.E.2d 742 (Ind. 2008). Based on its review, the court determined that "the documents obtained pursuant to the judicial subpoena can be admitted[.]" Accordingly, the court admitted pages 1, 4, 5, 6, 7 and 8, but did not admit pages 2 and 3, which contained Detective Finley's affidavit and subpoena.

The State acknowledges that the trial court did not consider whether the cellphone records fell within the business records exception to the rule against hearsay and that the requirements of Tennessee Rules of Evidence 803(6) and 902(11) were not met but asserts that the error was harmless because the records were only a "small part" of the State's case

and not "particularly compelling." Improperly admitted evidence is reviewed under a non-constitutional harmless error analysis. *State v. Carter*, 2010 WL 5343212, at \*13 (Tenn. Crim. App. Dec. 16, 2010) (citing *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003)). In determining whether non-constitutional errors are harmless, "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)).

We agree that the error in admitting the cellphone records was harmless. As noted by Detective Finley, the records showed that Mr. Campbell would regularly go several days without using his phone, and common sense suggests that Mr. Campbell was of a generation not completely reliant on a cellphone. The jury also heard evidence that the victims had a landline telephone and could have used the landline to place and receive calls instead of the cellphone. Therefore, we do not view evidence that Mr. Campbell did not use his cellphone after January 27, 2010, as substantially noteworthy. Moreover, the defendant admitted to visiting his parents the week of their deaths, and by his statements to officers, suggested that his parents were killed sometime after he left the morning of January 28. Again, the fact that Mr. Campbell did not use his cellphone after January 27 does not specifically negate that possibility. Furthermore, other evidence aside from Mr. Campbell's cellphone records supported the State's timeline and intimation that the defendant killed his parents before leaving their home the morning of January 28. This evidence included newspapers in the mailbox for January 28 and 29, medication logs with no entries past January 27, and the medical examiner's estimation that the victims died twenty-four to thirty-six hours prior to their bodies being discovered around 6:00 p.m. on January 29. Accordingly, we cannot conclude that the error in admitting the cellphone records "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). The defendant is, therefore, not entitled to relief.

## II.     Sufficiency

The defendant argues that the evidence is insufficient to sustain his convictions. The defendant does not dispute that the elements of premeditated first-degree murder were established but, instead, challenges the proof establishing his identity as the perpetrator. The State argues that the evidence is sufficient to sustain the defendant's convictions. We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn.

R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and "the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury." *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The perpetrator's identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). The identification of the defendant as the perpetrator is "a question of fact for the jury upon its consideration of all competent proof." *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015) (citing *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005)).

Viewed in the light most favorable to the State, the evidence shows that the defendant killed his parents while they slept during the early morning hours of January 28, 2010, and then staged the home to appear as if it had been burglarized. The defendant received financial assistance from his parents over the years but was in debt. Apparently realizing that he stood to gain more if they both were dead or worried that their aid would end, the defendant began establishing his alibi in the days leading up to the murders. The defendant visited his ex-wife, Linda, at her place of employment, something he had never done in thirteen years, and made the point of telling her that he was leaving town on Thursday, January 28. Linda found the defendant's communication to be very unusual. Mr. Champagne, the victims' next-door neighbor, recounted the victims' habits, specifically noting that Mr. Campbell retrieved the newspaper every morning and had done so on January 27. When the victims' bodies were discovered, the newspaper for January 27 was found inside the home, and the newspapers for January 28 and 29 were still in the mailbox. Purported medication logs found inside the home bore no entries past January 27. All of this evidence suggested that the victims did not wake up on January 28. Moreover, had the victims been awake in the kitchen when he left the morning of the 28th as the defendant reported to officers, it is illogical that their bodies were found in their beds both wearing the oxygen masks they wore for sleeping. Also illogical is that if the victims were killed during a burglary, why plainly visible jewelry, firearms, and other items of value were not taken.

Officers' processing of the crime scene revealed suspicious findings, including that the trash can in the kitchen had been emptied, the defendant's blood was on the bottle of Palmolive dish soap in the kitchen, and bedsheets were missing from the bed the defendant slept in during his visit. Bedsheets with a rust-colored stain were found under the seat in the defendant's truck, and although testing of the stain did not reveal the presence of blood, the analyst testified that the ability to detect blood would have been affected if the sheets had been cleaned with detergent or bleach. Fibers found on the bedsheets were consistent with fibers found on bedcovers recovered from the basement bedroom, suggesting that the bedsheets came from the victims' home. Examination of the spent shell casings from the bullets that killed the victims revealed that one of the bullets was from Mr. Campbell's supply of ammunition. The defendant's behavior following the murders is also revealing.

The defendant sold Mr. Campbell's grandfather clock shortly after the victims' deaths, claiming he was "clear" to do so, before initiating court proceedings to gain control of the estates. Viewed in the light most favorable to the State, the sum of the circumstantial evidence was sufficient for a rational trier of fact to determine that the defendant committed the premeditated first-degree murders of his parents.

## III. Sentencing

The trial court conducted a sentencing hearing in which the defendant's presentence report, a victim impact statement from Shawn Campbell, the victims' grandson, and certified judgments of the defendant's prior convictions for embezzlement and obtaining money by a false check were entered into evidence. Shawn testified that his grandmother had promised him certain items from her house, but the defendant "auctioned off" everything before he received them. As to his feelings concerning the defendant, Shawn said that "there is nobody walking the face of this earth that will have anything positive to say about him. He's been nothing but a plague and just a virus to anybody he's ever been around." Shawn continued that "anybody who has ever had [the defendant] in his life has a horrible story to tell."

By law, the defendant received life sentences for each of the first-degree murder convictions, and it was for the trial court's determination whether the sentences would be served concurrently or consecutively. In ordering consecutive sentencing, the trial court found the defendant to be a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime when the risk to human life is high. The trial court's reasoning for making this determination was as follows:

> The facts of this case would show that each victim was shot in the head, shot in a separate bedroom. The Court calls attention to that and makes those factual findings to show that it wasn't one event.
>
> There had to be some activity in one bedroom, when one victim was shot. And then there had to be more activity in the other bedroom.
>
> There's no evidence that the two victims were shot in the same location. They were shot in two separate locations in the house.
>
> The Court makes those findings and believes that under 40-35-115(B)(4) that in the Court's discretion, the Court can find that these actions are of a dangerous offender, whose behavior indicates little or no regard for human life and no hesitation about a crime for which the risk to life is high, the risk to human life is high.

So the Court finds that based on the fact that the first victim was murdered in one room and there had to be a time period before the second victim was murder[ed] in a separate room, that given the severity of the crime and the complete disregard for life of both victims, that consecutive sentences are necessary to protect the public.

And the Court finds that this sentence is reasonably related to the severity of the offense.

This Court reviews consecutive sentences imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859-60 (Tenn. 2013). A trial court "may order sentences to run consecutively" if it finds the defendant is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code. Ann. § 40-35-115(b)(4); *see Wilkerson*, 905 S.W.2d at 936. Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939. Our supreme court has stated that the trial court must make specific findings about "particular facts" which show the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

Although the trial court stated that consecutive sentences were necessary to protect the public and reasonably related to the severity of the offenses, the trial court failed to state the specific facts on which it relied to satisfy this conclusion. It is incumbent on the trial court to state facts that support each factor, and, in this case, it is particularly unclear what facts the court relied on in finding that an extended sentence was necessary to protect the public against further criminal conduct by the defendant. "The mere recitation of the *Wilkerson* factors is not a substitute for the requirement of making specific findings." *State v. Calloway*, 2005 WL 1307800, at *13 (Tenn. Crim. App. June 2, 2005); *see also State v. Craig*, 2002 WL 1972892, at *9 (Tenn. Crim. App. Aug. 27, 2002) ("A mere statement that confinement is necessary to protect society and that the severity of the sentence is reasonably related to the convicted offenses, without more, is insufficient to justify consecutive sentences [under *Wilkerson*]."). Because the trial court failed to make any specific findings regarding the defendant's actions as they related to the *Wilkerson* factors in determining that he was a dangerous offender, the record does not support consecutive sentencing. *Pollard*, 432 S.W.3d at 863 ("[W]hen trial courts fail to include the two additional findings before classifying a defendant as a dangerous offender, they have failed to adequately provide reasons on the record to support the imposition of consecutive

sentences."). Accordingly, this Court cannot defer to the trial court's exercise of discretion nor presume that the imposition of consecutive sentences was reasonable.

In *Pollard*, our supreme court explained that, when facing this situation, this Court has two options: "(1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." *Pollard*, 432 S.W.3d at 864 (citing *Bise*, 380 S.W.3d at 705 & n.41). Because the consideration required under *Wilkerson* involves a fact-intensive inquiry, the better course is to remand the case to the trial court to determine the propriety of consecutive sentencing. *Id.* Accordingly, we vacate the imposition of consecutive sentencing and remand to the trial court for a new sentencing hearing. The new sentencing hearing is limited to consideration of the *Wilkerson* factors to determine the propriety of consecutive sentencing in this case.

### *Conclusion*

Based on the forgoing authorities and reasoning, we affirm the defendant's convictions. However, we vacate the imposition of consecutive sentencing and remand to the trial court for further proceedings consistent with this opinion.

_____
J. ROSS DYER, JUDGE